## Case No. 14,467.

### UNITED STATES v. ARMSTRONG.

[2 Curt. 446; 19 Law Rep. 90.] [1]

Circuit Court, D. Massachusetts. Oct. Term, 1855.

HOMICIDE—EXTENUATING CIRCUMSTANCES—MALICE —DEADLY WEAPON—KILLING AT SEA—DEATH ON SHORE—JURISDICTION.

1. Though malice is not presumed merely from the fact of killing, yet the circumstances attending the homicide may be such that the law deems it malicious.

2. When the extenuating circumstance can be apprehended by the court, it is their duty to declare, as matter of law, whether it is sufficient to mitigate the offence; but when the case is such that the court cannot foresee what the jury may find the provocation was, only a general and hypothetical instruction can be given.

[Cited in Re Greene, 52 Fed. 111; U. S. v. Trans-Missouri Freight Ass'n, 7 C. C. A. 15, 58 Fed 67.]

[Cited in brief in State v. Nugent, 71 Mo. 137.]

3. That general instruction, in this case, was, that if the prisoner struck a fatal blow with a deadly weapon, it was not every actual assault which would extenuate the offence. The provocation must be such as to account for the act by reason of the infirmity of human passions in men in general, and without attributing to the prisoner a cruel and relentless disposition.

4. If the prisoner relies on an assault by the deceased, as extenuating his crime, he must show

---

1 [Reported by Hon. B. R. Curtis, Circuit Justice. 19 Law Rep. 90, contains only a partial report.]

such assault by some satisfactory evidence; the jury have no right to conjecture, without evidence, that it may have been made.

5. There is no act of congress which makes punishable an unlawful stroke on the sea, without malice, followed by death on shore. But the guilty person may be convicted of an assault with a dangerous weapon.

[Cited in Ball v. U. S., 140 U. S. 118, 11 Sup. Ct. 767.]

[Cited in Com. v. Macloon, 101 Mass. 15; People v. Tyler, 7 Mich. 180; U. S. v. Guiteau, 1 Mackey, 575, Append.]

The prisoner [James H. Armstrong] was indicted for the murder of William Thompson, by wilfully and maliciously striking him on the head with a hatchet, while on the high seas, on board a vessel of the United States called the bark Kelly, of which wound Thompson afterwards died on shore within the United States. It appeared in evidence, that Thompson was mate, and the prisoner cook of the bark; and that early in the morning of the 22d day of July, 1855, some words passed between the mate and the cook in consequence of the failure of the latter to get up and come to the galley promptly when called by the mate, and ordered to get coffee ready for the watch on deck. This was about four o'clock, a. m. About an hour after, the mate inquired if the coffee was ready, and learning it was not, told the cook if he failed to have it ready another morning by five o'clock, he would give him cause to complain to the captain. (At this time the cook was in the galley, and the mate outside.) The cook replied, "You had better not commence with me, sir, if you do, it will be the worse for you." The mate put one foot and his head into the galley, the other foot remaining on the deck outside, and a moment after, backed out, his head being on the cook's breast, his arm round the cook's waist, the cook's left arm around his neck, a hatchet in his right hand, with which he struck the mate on the head, and was in the act of repeating the blow, when he was seized and disarmed by some of the crew. The wound inflicted by the hatchet, penetrated the skull, and the vessel having put into the port of Boston, and landed the mate, he died from the effect of the wound in a few days. Immediately after the cook was seized and disarmed, one of the men said to him, "You have killed that man." He replied, "Let him die, he had no business to kick me."

J. A. Loring and W. S. Dexter, for the prisoner, contended that the burden was on the government to show a malicious killing; that the presumption was against malice; that unless the government had satisfied the jury beyond a reasonable doubt, that the mate did not kick the cook in the galley, and there offer such violence as would provoke the conduct of the cook through heat of blood and without malice, the jury were bound to presume such violence was offered, and so that this was not a malicious killing.

Mr. Hallett, U. S. Dist. Atty., argued contra.

In summing up the following instructions were given:

CURTIS, Circuit Justice (charging jury). In the case of U. S. v. Mingo [Case No. 15,781], tried here at the May term, 1855, this court, after careful consideration, laid down the rule, that whether the crime be murder or manslaughter, is not to be decided upon any presumption arising from the mere fact of killing; but that the government, besides proving the homicide, must offer sufficient legal evidence that the killing was malicious. And if, upon the whole evidence, the jury have reasonable doubt whether the killing was from malice, they cannot find the accused guilty of the crime of murder. To those principles we now adhere. But you will observe that they go no further than this; that the burden of proof is on the government to prove a malicious killing, and that proof of the mere fact of killing does not change this burden nor support it by raising a presumption of malice. But this is entirely consistent with such a presumption being raised by the circumstances under which the killing was effected. Mere homicide does not imply malice. But circumstances may attend a homicide, which, in point of law stamps it as malicious, without other evidence of malice. For malice may be, and is, implied by law, as well as expressly proved by direct evidence. And one ground for the implication of malice, is the nature of the act of the accused. If the prisoner, without such provocation or excuse as the law deems sufficient, intentionally struck a hatchet into the head of the deceased, and thereby killed him, the law deems this a malicious killing, and the offence is murder. In such a case, no other evidence of malice is required, than that furnished by the act itself. That being wicked, cruel, and barbarous, the law considers that it proceeded from a wicked and depraved heart, fatally bent on mischief. If, therefore, you find the prisoner intentionally struck the mate on the head with a hatchet, the blow being calculated to produce, and actually producing death, you should find him guilty of murder, unless there be some other circumstance in the case, which should control this implication of malice, and account for the act without its existence. The prisoner's counsel insist that there is. They urge that there is evidence tending to prove, that the mate assaulted the cook in the galley, and that moreover, as no one saw what passed there, you ought to presume, that the assault by the mate was of such a character as to excuse, if not to justify the homicide. But we do not think you can make any such presumption, in the absence of proof showing what was done by the mate. It is true the prisoner is entitled to the presumption that he is innocent, till his guilt is proved. But the same presumption exists in favor of the mate. The law will not presume without proof, that he wrongfuly assaulted the cook, any more

than it will presume without proof, that the cook assaulted him. It presumes no misconduct by either; misconduct must be proved. But when it has been proved, he who apparently was a wrongdoer, cannot escape, upon a suggestion not supported by any evidence, that another, and not himself was guilty, and therefore you cannot consistently with the rules of law, allow the prisoner the benefit of any mere conjectures of what might probably have happened in the galley. If the evidence points to any thing as having there happened, you are to consider it, but you are not to assume without evidence, that the mate's misconduct excused or extenuated the act of the prisoner. Rex v. Oneby, 2 Ld. Raym. 1500.

It is urged that the evidence shows the mate kicked the cook. It is true the cook so declared immediately after the affray, and his declaration is before you to be weighed in connection with the other evidence. You will consider the position in which the mate stood, leaning forward, the upper part of his body and one foot in the galley and the other on deck; the time which elapsed, the positions of the parties when they came out of the galley, and then you will say, if you are satisfied, the mate kicked the cook. If he did not, this ground wholly fails. If he did, still it does not necessarily follow that the killing was not malicious. Because there must be some reasonable proportion between the provocation given and the act of resentment. It is not every blow given which will account for the use of a deadly weapon. If the evidence in this case had described the provocation, it would be the duty of the court to declare, as matter of law, whether it would or would not be sufficient to remove the presumption of malice arising from the fatal use of a deadly weapon. But it is not practicable to do so in this instance, because we do not know what you may consider to have been done by the mate to the prisoner. We can, therefore, only say, that if a blow of considerable violence, excites the passions of the one assailed, and so causes him, in the heat of blood, to kill his assailant, the killing is not, in general, malicious; but that if a deadly weapon is used, the provocation should be very great as to be sufficient to extenuate the offence. If, from the evidence, you can find that the mate inflicted such a blow on the prisoner, as would account for his returning it with a blow on the head with a hatchet, without imputing to the prisoner any more than that infirmity of passion which belongs to men in general, then the act is not in law, malicious. But the law allows for the infirmity of our common nature, not for those violent and wicked passions which exist in some men; and if the act of the mate was such as to produce retaliation by a fatal blow with a deadly weapon, not by reason of the common passions of humanity, but from a cruel and relentless disposition, then the defendant is

guilty of a malicious killing, notwithstanding you may find the mate assaulted him.

Verdict, guilty of manslaughter only.

The prisoner's counsel moved an arrest of judgment, assigning for cause, that there was no act of congress which defined and punished the offence of giving a mortal blow on the high seas without malice, when the death therefrom occurred on shore.

This motion was argued by J. A. Loring and W. S. Dexter, in support thereof, and Mr. Hallett, Dist. Atty., in opposition thereto.

CURTIS, Circuit Justice. The twelfth section of the act of April 30, 1790 (1 Stat. 115), makes the crime of manslaughter on the high seas punishable by fine and imprisonment. It does not define the offence, otherwise than by the use of the term manslaughter. It thus remits us to the common law for its definition. Manslaughter is the unlawful killing of a human being without malice; and there is not such a killing on the high seas, if the death takes place on land. In accordance with this, Judge Washington, in U. S. v. Magill [Case No. 15,706], decided in 1806, held that a killing with malice from a stroke on the sea which produced death on shore, was not murder on the high seas. No doubt the fourth section of the act of March 3, 1825 (4 Stat. 115), under which this prisoner was indicted, was passed to remedy this defect of jurisdiction. But it applies only to a malicious killing on shore by a stroke at sea. The verdict of the jury negatives malice, which is an essential ingredient in this statutory offence. It is true, the offence described in the statute is not strictly murder; for it punishes the malicious stroke, given at sea, when the death occurs on land. But it is an offence of which one necessary ingredient is malice, and that is shown by the verdict not to have existed in this case. The district judge concurs in this opinion. Judgment arrested.

The prisoner was afterwards indicted in the district court, for an assault with a dangerous weapon, convicted, and sentenced to three years' imprisonment, with hard labor in the state prison at Charlestown.